UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RONALD KETCHAM,

                        Plaintiff,                      **OPINION AND ORDER**

      -against-                         17-cv-7140 (AEK)

THE CITY OF MOUNT VERNON, ALLEN
PATTERSON, and MICHAEL HUTCHINS,

                         Defendants.

------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

      Plaintiff Ronald Ketcham ("Plaintiff") brought this action against Defendants City of

Mount Vernon, Allen Patterson, and Michael Hutchins (collectively, "Defendants"), asserting

federal claims pursuant to 42 U.S.C. § 1983 for excessive force and unlawful seizure and arrest,

and claims pursuant to New York State law for battery, assault, and unlawful imprisonment.

ECF No. 16.[2]  The parties subsequently agreed to the dismissal of Plaintiff's claims for unlawful

seizure and arrest and false imprisonment, and their stipulation was so ordered by the Honorable

Vincent L. Briccetti on February 27, 2019.  ECF No. 38.  On December 30, 2019, Judge Briccetti

issued an opinion and order granting Defendants' motion for summary judgment, and the Clerk

---

[1] The parties have consented to the Court's jurisdiction pursuant to 28 U.S.C. § 636(c).
ECF No. 59.

[2] This case originally was filed on September 19, 2017, *see* ECF No. 1, but the operative
pleading is the amended complaint, which was filed on November 30, 2017, *see* ECF No. 16.
The defendants in the original complaint were the City of Mount Vernon and "John Does
Numbered 1 and 2."  *See* ECF No. 1.  In the amended complaint, Patterson and Hutchins were
named and references to "John Does" were eliminated.  *See* ECF No. 16.  The John Doe
defendants therefore should have been removed as parties as of the filing of the amended
complaint on November 30, 2017, yet they are still mistakenly listed as active defendants on the
docket.  The Clerk of Court is respectfully directed to terminate the John Doe defendants.

of Court issued a judgment in favor of Defendants for the reasons stated in the December 30, 2019 decision.  ECF Nos. 50, 51.  Plaintiff filed a timely notice of appeal on January 3, 2020.  ECF No. 52.  By decision dated March 29, 2021, the Second Circuit Court of Appeals vacated the judgment of the district court and remanded the case for further proceedings consistent with that opinion; the mandate from the Court of Appeals was issued on April 19, 2021.  ECF Nos. 53, 54; *see Ketcham v. City of Mount Vernon*, 992 F.3d. 144 (2d Cir. 2021).  Upon remand, the parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c), ECF No. 59, and subsequently withdrew their previously filed jury demands and consented to a bench trial pursuant to Rule 38(d) of the Federal Rules of Civil Procedure, ECF No. 62.

The Court conducted a two-day bench trial on November 1, 2021 and November 2, 2021, with closing arguments delivered on November 4, 2021.  Plaintiff and his wife, Patricia Ketcham, testified on Plaintiff's behalf, and Patterson and Hutchins testified on behalf of Defendants.  For the reasons that follow, the Court finds that Plaintiff has not proven any of his claims by a preponderance of the evidence.

### FINDINGS OF FACT

The Court makes the following findings of fact as required by Rule 52 of the Federal Rules of Civil Procedure.

### I.      Prelude

On March 28, 2017 at approximately 4:30 p.m., Plaintiff, a retired United States probation officer, was walking along Main Street in New Rochelle, New York on his way to a nearby market.  Trial Transcript ("Tr.") 9-11.

Meanwhile, that same afternoon, Patterson and Hutchins were working on the Warrant Squad of the City of Mount Vernon Police Department.  Tr. 157, 280.  Patterson and Hutchins

were seeking to execute multiple warrants that day, including an arrest warrant for an individual named Dominic Uzillia, who was wanted for the misdemeanor offense of forcible touching.  Tr. 157-58, 282.  Patterson and Hutchins had attempted to find Uzillia several times before March 28, 2017, and had focused their efforts to locate him in the City of New Rochelle, as they had a known address for Uzillia there.  Tr. 158-59, 282-83.  As their shift progressed, the officers drove from Mount Vernon to New Rochelle in their assigned vehicle, a light blue unmarked Crown Victoria equipped with lights and sirens, with Hutchins driving and Patterson in the front passenger's seat.  Tr. 160-61, 284.  The officers had a picture of Uzillia with them.  Tr. 159-60, 285; *see* Defs.' Ex. C.  As the officers traveled northbound in their vehicle along Main Street, Patterson indicated to Hutchins that he saw someone who fit Uzillia's description walking southbound on the sidewalk on Main Street, and told Hutchins to stop the car so they could investigate.  Tr. 161-63, 285-86.

## II.     The Encounter between Plaintiff and Defendants Patterson and Hutchins

The parties' accounts of what happened next differ sharply.

### A.     Plaintiff's Testimony

According to Plaintiff, he first heard car brakes "screeching" on his right-hand side, and when he turned in that direction, he saw an individual approaching him quickly.  Tr. 11, 73.[3] Patterson appeared to have exited the passenger side of an unmarked blue-gray sedan, and was approximately three to five feet away from Plaintiff when Plaintiff first observed him.  Tr. 12. Patterson was dressed in plain clothes, and Plaintiff testified that Patterson did not identify who he was or display anything identifying himself as a police officer.  Tr. 12-13.  At some point as

---

[3] Throughout his trial testimony, Plaintiff referred to the individual who approached him only as the "passenger."  *See, e.g.*, Tr. 12, 73.  There is no dispute, however, that person who Plaintiff referred to as the "passenger" was, in fact, Patterson.

Patterson approached him, Plaintiff saw that Patterson was wearing a badge or shield around his neck, but Plaintiff could not read any numbers or letters on the shield.  Tr. 15, 75.  While Patterson was approaching, Plaintiff was standing approximately three feet from a chain link fence that surrounded a gas station that was under repair; Plaintiff's back was positioned toward the fence.  Tr. 14, 80.

The first thing Plaintiff heard Patterson say was "who are you?," to which Plaintiff answered, "who are you?"  Tr. 13, 76.  Plaintiff testified that although Patterson had come "very close" to him, Plaintiff did not physically react, and remained "frozen."  Tr. 74, 76-77.  Patterson then said to Plaintiff, "I'm taking you in," and Plaintiff responded, "for what?," and asked to see a uniformed police officer.  Tr. 13, 15.  Plaintiff testified that Patterson did not respond and instead grabbed Plaintiff's wrist, spun him around, twisted his wrist behind him, and pushed it up behind his shoulder blades.  Tr. 13-14, 83-84.  Within seconds, Plaintiff started "screaming at the top of [his] lungs."  Tr. 79-80.

Patterson proceeded to push Plaintiff toward the chain link fence, and at various points different parts of the front of Plaintiff's body, including his head, chest, and knees, were in contact with the fence.  Tr. 14.  Plaintiff testified that he did not exert any force as Patterson pushed him against the fence, as Patterson's hold had "immobilized" him.  Tr. 14-15, 18. Plaintiff testified that he was frightened, and did not know if he was being abducted or robbed. Tr. 14.  According to Plaintiff he was up against the fence for approximately "a minute or two"; during that entire time he was moving his head from the left to the right and screaming, asking for people on the street to help and to call 9-1-1.  Tr. 17, 84-86, 89.  Plaintiff screamed to the point that his voice became hoarse, Tr. 17, but no bystanders intervened.  As he was pressed against the fence, Plaintiff noticed that Patterson carried a handgun that was "properly

holstered."  Tr. 86.  As Plaintiff yelled, he recalled hearing Patterson say "two or three times"

that he would "put [Plaintiff] on [his] knees"—a statement that Plaintiff found "frightening"

because he had previously undergone a knee replacement in 2012, and had two prosthetic knees.

Tr. 17-18.  At no point during this incident did Patterson actually "put Plaintiff on his knees" or

attempt to do so.  Tr. 88.

While Plaintiff was against the fence, he was handcuffed behind his back, and Patterson

then turned him around from the fence and started pushing Plaintiff towards the car.[4]  Tr. 18.

During that time Plaintiff continued to yell "call 9-1-1" and "call the police"; he continued to

fear that he was being abducted, was not going willingly into the car, and did not stop screaming

until he was inside of the car.  Tr. 18, 83, 89-92.  According to Plaintiff, when they reached the

car, Patterson put his hand against the side of Plaintiff's head and pushed it into the metal frame

of the car door, prompting Plaintiff to say, "why did you do that?"; Patterson did not respond.

Tr. 18-19.

Plaintiff testified that the individual he referred to as the driver of the car—Hutchins—

did not do anything as Patterson twisted Plaintiff's arm behind his back, pushed him into the

chain link fence, and pushed his head into the car door frame, even though Hutchins's view

during the encounter was not obstructed, and Hutchins was standing at most three to five yards

away.  Tr. 29-31; *see also* Tr. 300.

Plaintiff testified that he was placed in the back seat of the car, behind the front passenger

seat.  Tr. 22.  Patterson sat in the front passenger seat and Hutchins sat in the driver's seat.  Tr.

22-24.  While Plaintiff sat in the back, Hutchins and Patterson had an "exchange"—they passed a

---

[4] Plaintiff testified that he did not actually realize that he had been handcuffed until he was in the back of the police vehicle.  Tr. 87, 95-96.

folder between them, and one of them took out a photograph.[5]  Tr. 24.  Plaintiff heard Patterson

say that they were "executing a New York State parole warrant," which prompted Plaintiff to

reply that they had "the wrong guy" and that he "used to do this for a living."  Tr. 24.  Plaintiff

told Patterson and Hutchins "this is what I did for a living for 28 years, I'm not on parole, I don't

have a parole warrant outstanding for me."  Tr. 25.  Patterson asked to see Plaintiff's

identification, but Plaintiff told him that he could not get his identification—his New York State

Driver's license and a pistol carry permit issued by Westchester County—because he could not

move his hands; Plaintiff also testified that it was at this point that he told officers that the

handcuffs were too tight and that they were hurting him.  Tr. 24, 25, 26, 96.  Patterson got out of

the car, retrieved Plaintiff's wallet, and examined the identification documents; Patterson then

asked the driver for a handcuff key, got out of the car, came to the back seat, took Plaintiff out of

the back seat, and unlocked the handcuffs.  Tr. 26-27.  Plaintiff testified that the handcuffs were

removed "within a couple of seconds of that conversation."  Tr. 96-97.  In total, Plaintiff

estimated that he was in the back of the car, in handcuffs, for approximately two to three

minutes.  Tr. 97-98.

    At some point after the handcuffs were removed, Plaintiff told Patterson, "you shouldn't

treat people like that."  Tr. 27.  Hutchins asked Plaintiff if he wanted a ride home, and Plaintiff

declined the offer.  *Id.*  As Plaintiff proceeded to his original destination, the market, he turned

around and memorized the car's license plate.  *Id.*

    Once he returned home, Plaintiff asked his wife to join him while he made a phone call to

his son so that he only had to tell the story once.  Tr. 36.  Plaintiff reported feeling "rattled,"

---

    [5] Around this time Plaintiff saw a photograph of Uzillia, the man who Patterson and
Hutchins had been looking for to arrest; Plaintiff conceded at that time that the photograph of
Uzillia did look like him.  Tr. 99-100.

"frightened," and "traumatized."  *Id.*  Plaintiff's wife, Patricia Ketcham, testified that her husband was shaking, and was a "different kind of upset than I had ever seen before."  Tr. 137. Plaintiff testified that he made three phone calls that evening: one to his son, one to the New Rochelle Police Department, and one to the Mount Vernon Police Department.  Tr. 36.  He spoke to a dispatcher at the New Rochelle Police Department and gave an account of what happened, telling the dispatcher that he did not know if the encounter was an attempted abduction or attempted robbery.  Tr. 37.  Plaintiff recalled that he then had a conversation with a New Rochelle Police detective, and he told the detective that two individuals who claimed they were executing a New York State parole warrant accosted him, handcuffed him, and hit his head in the course of forcing him into the back of a car.  Tr. 38.  Plaintiff testified that he then called the Mount Vernon Police Department and spoke with a supervisor.  Tr. 39-40.

Plaintiff's son, an attorney, advised Plaintiff and his wife to take photographs of Plaintiff's wrists; Plaintiff also took pictures of his knees.  Tr. 40-41, *see* Pl.'s Ex. 1.  Plaintiff described his injuries as broken skin on both wrists, bruising, and scratched knees.  Tr. 41. Plaintiff noted that there was no abrasion or bruise on his head from where it hit the car, and it "did not really hurt."  *Id.*  Similarly, Patricia Ketcham noted that with respect to his head, "[t]here was really nothing to see."  Tr. 138.  Plaintiff believed the injuries on his wrist were from the handcuffs, and testified that bruising on his wrists remained painful for several days. Tr. 41-43.  He did not feel any pain from injuries to his knees.  Tr. 52.  Plaintiff did not take any pain medication for his knee and did not seek any medical attention for his head.  Tr. 111-12. Plaintiff testified that as a result of the incident he was "thoroughly traumatized," and that when something triggered memories of the incident the trauma and fear would resurface.  Tr. 52-54. Plaintiff noted that since he relocated to Boston in September 2019, he has been back to New

Rochelle several times, but he deliberately avoids the area where the incident took place.  Tr. 54, 57.

## B.   Defendants' Testimony

According to Patterson, when he exited the car believing that Plaintiff was Uzillia, he was wearing civilian clothes but had his silver police shield "outside [his] outer-most garment," suspended from his neck on a string.  Tr. 163-64.  Patterson testified that he approached Plaintiff "pretty briskly" and he said "Mount Vernon Police Warrant Squad; may I see your identification, please?," Tr. 164, 166, and also said "something to [the] effect" of "[y]ou resemble a party that we're looking at," Tr. 200.  Patterson extended his right hand with his palm facing downwards, as an indication to Plaintiff to stop.  *Id.*  At the time Patterson exited the car, Plaintiff was approximately ten feet away, further north on the street, but when Patterson first identified himself to Plaintiff as being a member of the Warrant Squad, they were only two feet apart.  Tr. 164-65, 167.

Patterson testified that when he asked for Plaintiff's identification, Plaintiff replied, "for what, for what," in a "defiant" type of tone.  Tr. 168.  According to Patterson, after he asked Plaintiff for his identification, Plaintiff bent his knees and assumed what Patterson described as a "fighting stance," though he added that Plaintiff did not have his hands up with his fists balled.  Tr. 176.  Patterson testified that Plaintiff then "basically took his chest area and shoulder and pushed past me, or attempted to push past me."  Tr. 168.  Patterson described the act as a "body check," in which Plaintiff "used his upper body . . . and his right shoulder to push against my shoulder chest area to move me out of the way."  Tr. 203.  At this point, according to Patterson,

he put Plaintiff in an "arm bar"[6] with the objective of attempting to put him in handcuffs.  Tr. 170.  In the course of this action, Patterson moved Plaintiff onto the fence because, according to Patterson, Plaintiff was "trying to escape the arm bar . . . [b]y trying to move his right arm and flailing his left arm and twisting his body."  Tr. 171.  While Plaintiff was pressed against the fence, "he tried to push back and twist his body left and right to evade being put . . . in handcuffs and possibly escape."  Tr. 172.  During this time Plaintiff was screaming in a "very loud" voice that he was "being abducted by fake cops."  *Id.*  According to Patterson, after a brief struggle with Plaintiff "flailing his arms and twisting his body and trying to . . . wiggle out of my grasp," Hutchins was able to secure Plaintiff into handcuffs.  Tr. 173.  According to Patterson, it took him and Hutchins "a lot" of force to get Plaintiff into handcuffs because they had to "use and match force to overcome him to get him in cuffs because of his resisting."  Tr. 177.  Once Plaintiff was handcuffed, however, Patterson testified that "the force basically stopped."  *Id.*  That said, while he was handcuffed, Plaintiff continued to scream.  *Id.*  Patterson testified that from the time he exited the car to the time that Plaintiff was in handcuffs, approximately five minutes elapsed.  *Id.*

Hutchins testified that he exited the car a few seconds after Patterson, after he parked the car.  Tr. 287.  The first thing that Hutchins heard Patterson say to Plaintiff was to ask Plaintiff what his name was.  *Id.*  Hutchins recalled that Plaintiff replied "who wants to know," and that Patterson responded that Plaintiff "had an active warrant by the City of Mount Vernon and that he was under arrest."  Tr. 288.  According to Hutchins, Plaintiff "bladed himself" by taking a

---

[6] Patterson described an arm bar as "a police technique taught to basically lock your—whichever arm you're going to grab, lock it out to be able to gain compliance of a suspect to put him in handcuffs."  Tr. 170.  Plaintiff was also familiar with the "arm bar" technique from his law enforcement training, Tr. 63, and indicated during his testimony that Patterson had put him in an "arm bar," Tr. 83, 84.

step back, placing his shoulder in contact with the fence; Hutchins interpreted this posture as Plaintiff assuming a "fighting stance."  Tr. 288, 289.  Hutchins testified that either he or Patterson advised Plaintiff to put his hands behind his back and then "immediately" went to grab for Plaintiff's wrists.  Tr. 288.  Both he and Patterson got hold of Plaintiff's wrists and were trying to place him in handcuffs.  Tr. 288-89.  Hutchins estimated that it took "about two or three minutes" between the time that he first grabbed Plaintiff by the hand to the time the officers had him in handcuffs because Plaintiff was screaming very loudly that the officers were attempting to kidnap him, and swaying his torso back and forth to prevent the officers from getting a good grasp on his wrists.  Tr. 289-90.  Hutchins recalled that he placed cuffs on Plaintiff's left wrist and that Plaintiff was handcuffed behind his back.  Tr. 290-91.  Plaintiff continued to "scream at the top of his lungs" that he was being kidnapped, and asked bystanders to call the police.  Tr. 290.

Patterson testified that once Plaintiff was handcuffed, he grabbed the chain that connected the cuffs and guided Plaintiff to the car.  Tr. 177.  According to Patterson, when the car door was opened, Plaintiff stuck out one of his legs in a locked straight position against the frame of the car door to prevent the officers from putting him in the car.  Tr. 177-78.  Patterson repeatedly told Plaintiff to "stop resisting," and recalled that one of the officers managed to move Plaintiff's leg from car.  Tr. 179.  Patterson testified that he put his hand on the top of Plaintiff's head to guide him into the car so that his head would not hit the door, but "as a result of [Plaintiff] still not being compliant," Plaintiff's head hit the top part of the open car door.  *Id.*  Patterson testified that when he observed Plaintiff's head hit the door, neither he nor Plaintiff said anything.  *Id.*  As the officers were trying to put Plaintiff in the back seat, he continued to scream loudly that he was being abducted.  Tr. 180.

Hutchins also testified that once he and Patterson brought Plaintiff to the car, Plaintiff extended his leg and placed it on the bottom of the hinge of the passenger door to prevent the officers from putting him in the car.  Tr. 290-91, 293.  According to Hutchins, he then asked Plaintiff several times to have a seat in the vehicle and placed his hand on Plaintiff's left shoulder, and eventually Plaintiff moved into the car.  Tr. 291, 293.  Hutchins did not observe Patterson put his hand on Plaintiff's head, and did not observe Plaintiff strike his head on the car as he got inside.  Tr. 293, 305.  Hutchins testified that when Plaintiff entered the car, "the screaming and yelling stopped."  Tr. 294.

Patterson also testified that when the officers managed to get Plaintiff into the car, "his demeanor changed immediately."  Tr. 180.  According to Patterson, Plaintiff told them "I'm on your side, I'm law enforcement, ex-law enforcement, I have my I.D. in my right pants pocket." *Id.*  Patterson asked Plaintiff if he could take out his identification, and when Plaintiff said he could, Patterson exited the passenger side of the car, opened the rear door, and removed Plaintiff's wallet from his pocket.  Tr. 180-81.  Upon seeing Plaintiff's identification, Patterson asked Hutchins for a handcuff key and released Plaintiff from the handcuffs.  Patterson testified that he did not hear Plaintiff complain about the handcuffs and observed no injuries to Plaintiff's wrists or his head.  Tr. 181-82.  He recalled that less than a minute elapsed between the time that Plaintiff identified himself as a former law enforcement officer to the time that Plaintiff's handcuffs were removed.  Tr. 183.  Patterson testified that his last interaction with Plaintiff was releasing Plaintiff from the handcuffs.  Tr. 185.  Patterson also testified that at some point while Plaintiff was handcuffed in the back of the car, Plaintiff observed Patterson and Hutchins passing the picture of Uzillia between them, and when Patterson asked, "doesn't that look like you?," Plaintiff agreed that it did.  Tr. 182.

Hutchins recalled that once Plaintiff was in the car, he got into the driver's seat, Patterson got into the passenger's seat, and before Hutchins began to drive away, he turned around to Plaintiff and said, "we been looking for you for a long time, Mr. Uzillia." Tr. 293-94. Hutchins testified that Plaintiff responded, "that's not my name. My name's Ronald Ketcham." Tr. 294. According to Hutchins, Plaintiff told them he had identification in his rear pocket, and Patterson got out of the vehicle to retrieve the wallet from Plaintiff's pocket. *Id.* Patterson then confirmed that Plaintiff's real name was Ronald Ketcham. *Id.* Hutchins also testified that he did not hear Plaintiff make any statements or complaints about the manner in which he was handcuffed. Tr. 294-95. He estimated that Plaintiff was in the car for approximately two minutes before he was released. Tr. 295. Hutchins testified that the officers "apologized for the interaction between us," and Plaintiff said he understood. *Id.* Hutchins also testified that they asked Plaintiff whether he needed a ride home. *Id.* Hutchins testified that he did not observe any injury to any part of Plaintiff's body, and that Plaintiff also did not complain about any injuries once he was out of the handcuffs. Tr. 296.

With respect to "double locking" of handcuffs, Patterson explained that handcuffs have a "double lock" mechanism which, when used, ensures that if a suspect moves around while handcuffed, the handcuffs will not continue to tighten around their wrists. Tr. 183-84. If the "double lock" mechanism is not activated, handcuffs can become tighter around an individual's wrists "if [he or she] move[s] around a lot." Tr. 184. Patterson testified that he was trained to use double locking, but was not able to double lock the handcuffs during this incident because Plaintiff was "actively resisting," and that a suspect needed to be compliant in order for an officer to double lock handcuffs. Tr. 184-85. While there was a short period of time after Plaintiff had been handcuffed when, according to Patterson, Plaintiff stopped resisting, this was

not enough time to "double lock" the cuffs, "because as soon as he stopped, he basically started right back up again when [Patterson] started to guide him towards the car."  Tr. 268.  Hutchins testified that he had the key to the handcuffs, but did not double lock Plaintiff's handcuffs—even though that was normally his practice when he placed suspects in the back of patrol cars—because Plaintiff became "resistant" and placed his foot in the doorjamb.  Tr. 296-97.

Patterson testified that when he and Hutchins returned to the police station, they reported the interaction with Plaintiff to their supervisor, Sergeant Krista Mann.  Tr. 220-21; *see* ECF No. 78 at 5.  Sergeant Mann instructed them to write down what happened on an incident report.  Tr. 229.  Hutchins prepared the report, and Patterson reviewed it.  Tr. 222-24; *see* Pl.'s Ex. 9; Tr. 319-25.

### III.    Credibility Findings and Assessment of Key Disputed Issues

"As the finder of fact, the Court is entitled to make credibility findings about the witnesses and testimony and to draw reasonable inferences from the evidence presented." *United States v. Asare*, 476 F. Supp. 3d 30, 26 (S.D.N.Y. 2020).  Here, the Court cannot conclude that the testimony of any of the three witnesses directly involved in the March 28, 2017 encounter fully, credibly, and accurately depicts the interaction between Plaintiff, Patterson, and Hutchins on that day.  Certain aspects of each story appear to be genuine, while other aspects of each story appear to be overstated in different ways.  Accordingly, the Court finds aspects of each witness's account credible, and makes the following findings of fact based on all of the testimony and documents received in evidence.

As an initial matter, the Court does not credit Patterson's testimony regarding the manner in which he introduced himself to Plaintiff.  Patterson testified that as he approached Plaintiff, he identified himself as a member of the Mount Vernon Police Warrant Squad, asked Plaintiff for

13

identification, and informed him that he "look[ed] like someone we're looking for who has a warrant." Tr. 164, 168.  But if Patterson had clearly identified himself in this way, it is highly unlikely that the March 27, 2018 encounter would have proceeded the way it did.  While Plaintiff acknowledged that he had some inkling during the encounter that Patterson was a police officer—he observed Patterson's badge as he approached, Tr. 75; he recognized the "arm bar" as a law enforcement technique, Tr. 83-84; and he saw Patterson's properly holstered firearm, Tr. 86—there would have been no need for Plaintiff to attempt to deduce Patterson's identity had Patterson clearly identified himself at the outset.  Moreover, Plaintiff had no reason to be concerned about an interaction with law enforcement on March 28, 2017—contrary to Uzillia, the man Plaintiff resembled, Plaintiff had no outstanding warrants for his arrest, and indeed had a long service record as a law enforcement officer himself.  Therefore, Plaintiff's reaction to Patterson and Hutchins almost immediately after their encounter began—screaming at the top of his lungs, yelling for people on the street to call 9-1-1, and an ongoing sense that he was being abducted and/or robbed—only makes sense if he did not understand that Patterson and Hutchins were police officers.  On balance, the testimony of both Plaintiff and Hutchins—who reported that Patterson's first words to Plaintiff were to ask Plaintiff who he was, rather than identifying himself as a Mount Vernon police officer, Tr. 13, 287—are the more credible recitations of how the March 28, 2017 encounter began.

The Court also does not find at all credible Patterson's testimony that Plaintiff initiated contact during the encounter by attempting to push past him and "body checking" him.  *See* Tr. 168-69, 203.  This testimony is inconsistent with the recollections of Plaintiff—who testified that he remained "frozen" as Patterson came upon him, Tr. 77—and Hutchins, who observed that Plaintiff "bladed himself" by taking a step backwards towards the fence as Patterson approached,

Tr. 288-89.  But Plaintiff's testimony that he was entirely "frozen" as Patterson approached him is also difficult to reconcile with Plaintiff's obvious concern for his own welfare as Patterson closed the gap between them in a matter of seconds.  Indeed, Plaintiff may well have perceived himself to be remaining still even while he was making small movements that would have been consistent with his state of mind and also the observations of both Patterson and Hutchins. Patterson's own testimony about Plaintiff's immediate reaction—that he bent his knees as Patterson came closer, Tr. 176—is considerably more credible than his testimony about "body checking."  It is generally consistent with Hutchins's testimony, and also makes sense in the context of Plaintiff's testimony about the fear he was experiencing as he was approached quickly on the street by a man he did not recognize.  Both Patterson and Hutchins testified that they interpreted Plaintiff's initial physical reaction—whether bending his knees or taking one step backwards—as the assumption of a fighting stance, even though Plaintiff had not raised his arms or balled his hands into fists.  These similar (though not identical) elements of testimony from the officers are credible, and it is understandable that the officers understood Plaintiff to be positioning himself in a way that made it appear as though he was prepared to defend himself rather than voluntarily comply with police requests.  Plaintiff's responses to Patterson's initial questions and statements—"who are you," and "I'm taking you in"—were challenging rather than compliant (asking Patterson "who are you," and responding "for what"), and Patterson and Hutchins reasonably believed they were interacting with Uzillia, a man for whom they had an active arrest warrant and who they believed resided nearby.  Taking all of this evidence together, the Court finds that the lack of clarity by Patterson at the outset, combined with Plaintiff's significant resemblance to Uzillia, Plaintiff's defensive responses to Patterson's remarks, and

Plaintiff's minor adjustments of his body in a manner that suggested a defensive posture led to the unfortunate series of events that followed.

With respect to the portion of the encounter when Plaintiff was handcuffed and placed against the fence, the Court credits Hutchins's testimony that he was directly involved in the process of placing handcuffs on Plaintiff, rather than Plaintiff's testimony that Hutchins was standing by as an observer. The Court also credits the generally consistent testimony of both Patterson and Hutchins that Plaintiff was "twisting his body" and/or "swaying his torso" as they were attempting to apply handcuffs. Tr. 171, 289. Plaintiff testified that he was screaming and yelling from the moment the officers initiated physical contact with him to the moment he was placed into the police vehicle, and he was genuinely terrified that he was being abducted on the street. While Plaintiff recalled being "immobilized" throughout the encounter, he also acknowledged that he was moving his head constantly from side to side even after he was against the fence. Tr. 17, 84-86, 89, 92. The officers' similar (though not identical) testimony about Plaintiff's movements during this portion of the encounter is credible, and Plaintiff's acknowledgement that he was moving some parts of his body and was so agitated that he was yelling and screaming to such a degree that his voice became hoarse, leads the Court to determine that Plaintiff was, in fact, moving his torso to a substantial degree as Patterson and Hutchins attempted to handcuff him. Part of the reason the Court resolves this discrepancy in this manner is that it is reasonable to infer that the officers' recollections are consistent with the physical reactions of an individual who was as concerned for his safety and well-being as Plaintiff evidently was at that time.

As for the moments when Plaintiff was moved from being against the fence to being in the police vehicle, the Court credits the testimony of both officers, who explained that Plaintiff

16

stuck out one of his legs in a locked position against the bottom of the car door to prevent the officers from putting him inside.  Tr. 177-79, 290-91, 293.  Plaintiff had "no recollection" of using his foot to stop himself from going into the car.  Tr. 90.  But Plaintiff was still screaming to passersby to call the police at this time, and "absolutely" did not want to enter the car, because he still thought that he was in the process of being abducted; it is therefore reasonable to conclude that Plaintiff, in his general state of distress, as he was being guided towards the car, pushed his leg against the car, perhaps even without realizing it.  *See* Tr. 90-92.

Additionally, the Court finds that Patterson placed his hand on Plaintiff's head and that Plaintiff's head did, in fact, make contact with the metal frame of the car, as both Plaintiff and Patterson testified.  But in the context of the chaotic scene—with Plaintiff still screaming and yelling, not wanting to get into the car, and actively trying to prevent himself from being placed in the car—the Court cannot conclude that Patterson deliberately pushed Plaintiff's head into the door.  Rather, the Court finds that Plaintiff's head was inadvertently caused to come into contact with the door as a result of the difficulties that Patterson and Hutchins were having getting Plaintiff into the vehicle.  This portion of the encounter was yet another unfortunate byproduct of the misunderstanding that began with Patterson's initial approach, and continued with Plaintiff's significant reaction based on his fear and apprehension about what was transpiring.

Finally, while there are some inconsistencies in the testimony about exactly what happened and what was said once Plaintiff was inside the police vehicle, the general contours of the testimony are essentially the same.  The officers spoke to each other, Plaintiff developed an understanding that they were (or were claiming to be) police officers attempting to execute a warrant, and Plaintiff told the officers that he was not the person for whom the officers had a warrant.  In a short sequence of events that lasted no more than two to three minutes, Plaintiff

told the officers that he had identification, Patterson removed the identification from Plaintiff's

pocket, and when it became clear that Plaintiff was not Uzillia, Plaintiff was released from

handcuffs and let go.  Even though neither Patterson nor Hutchins recalls hearing Plaintiff make

a complaint about his handcuffs being too tight, the Court credits Plaintiff's testimony that he did

make such a complaint once he was in the car.  Plaintiff admitted, however, that he did not even

realize that the handcuffs were on his wrists until he was inside of the car, and that the handcuffs

were removed very shortly after he complained about them.

## CONCLUSIONS OF LAW

In order to prevail on his claims, Plaintiff "bears the burden of proving the elements of

his claim by a preponderance of the evidence."  *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195

(S.D.N.Y. 2019); *see Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993); *Ruggiero v.*

*Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991).  "The burden of showing something by a

preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of

a fact is more probable than its nonexistence."  *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121,

137 n. 9 (1997) (quotation marks omitted).

## I.    Excessive Force Claim

### A.    Legal Standards

"To prevail on a claim brought under Section 1983, a plaintiff must prove, by

preponderance of the evidence, '(1) the violation of a right secured by the Constitution and laws

of the United States, and (2) the alleged deprivation was committed by a person acting under

color of state law.'"  *Toliver v. New York City Dep't of Corr.*, 202 F. Supp. 3d 328, 334

(S.D.N.Y. 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir.

2015)).  The parties have stipulated that Patterson and Hutchins were acting under the color state

law at the time of the incident, and therefore that Plaintiff has established this element of his Section 1983 claim.  Tr. 367-68; ECF No. 78 at 4.

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks omitted).  Proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  These three considerations are known as the "*Graham* factors."  *See Brown v. City of New York*, 798 F.3d 94, 100, 102 (2d Cir. 2015).

"[R]easonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"—indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (cleaned up).  Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

This reasonableness inquiry is an "objective" one: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them,

without regard to their underlying intent or motivation." *Id.* at 397. "*Graham* thus stands for the

proposition that a government officer may not intrude on a person's Fourth Amendment rights by

employing a degree of force beyond that which is warranted by the objective circumstances of an

arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019).

## B.   Application of the *Graham* Factors

Neither of the first two *Graham* factors suggested in advance the need for any type of

force to apprehend the individual who Patterson believed to be Uzillia on March 28, 2017. The

warrant for Uzillia's arrest was for the misdemeanor crime of forcible touching, Tr. 158, 244,

282, which does not on its face suggest the need for a forceful response, *see Cugini*, 941 F.3d at

613 (finding that the misdemeanor offense of stalking and harassment at issue was "a relatively

minor one"). Patterson and Hutchins had no reason to anticipate that Uzillia would pose an

immediate threat—Patterson testified that there was no information to suggest that Uzillia would

be dangerous or armed, that he had a history of violence, or that he had any history of charges or

convictions for resisting arrest or assaulting officers. Tr. 244-45. Moreover, as to the actual

interaction with Plaintiff, Patterson testified that he did not feel he was in danger at any point,

and neither Patterson nor Hutchins called for backup at any time during the incident. Tr. 208,

245.

The third *Graham* factor—whether the suspect is actively resisting arrest or attempting to

evade arrest by flight—is what gives rise to the officers' decision to apply a degree of force in

their interaction with Plaintiff. Even though, contrary to Patterson's testimony, Plaintiff did not

initiate physical contact with the officers, his adoption of a defensive physical posture and his

challenging responses to Patterson's questions and statements made it objectively reasonable, in

light of all of the circumstances presented at that moment, for Patterson and Hutchins to initiate

the process of attempting to physically restrain Plaintiff and take him into custody.  At that point, Patterson and Hutchins were seeking to execute an arrest warrant for Uzillia, were still reasonably under the impression that Plaintiff *was* Uzillia, and were therefore taking steps that were reasonably necessary to effectuate the arrest.  Then Plaintiff began to physically resist to a greater degree, moving and twisting his torso and moving his head, all while screaming at the top of his lungs, such that it took two officers a period of minutes to ultimately place Plaintiff into handcuffs.  There is no question that some degree of force was used at this stage of the encounter, but in light of the Court's factual findings regarding Plaintiff's movement and conduct at this time, the Court concludes that the degree of force used by the officers to place Plaintiff in handcuffs in order to place him under arrest—including the use of the arm bar technique, the application of the handcuffs, and placing Plaintiff against the chain link fence— was objectively reasonable in light of the circumstances presented.

It is clear that that pushing an arrestee's head into a police car door can constitute excessive force.  *See Ketcham*, 992 F.3d at 151; *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004).  But as the Court already has concluded as a factual matter that the portion of the encounter in which Plaintiff's head came into contact with the frame of the car was not a deliberate action by Patterson to apply force but rather an unfortunate consequence of the difficulty associated with getting Plaintiff into the police vehicle, the head/door contact also cannot be considered excessive force in light of the totality of the circumstances at that time.

### C.    Tightness of the Handcuffs

To determine whether a plaintiff has sufficiently alleged a claim for excessive force in the process of handcuffing, courts consider three evidentiary factors: whether "(1) the [arrestee's] handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the

handcuffs were too tight; and (3) the degree of injury to the [arrestee's] wrists." *Cugini*, 941 F.3d at 612-13 (quotation marks omitted). "A court's reasonableness analysis is not limited to a factual checklist," however, as courts must always balance the nature and quality of the intrusion and the countervailing government interests at stake. *Id.* at 613 (citing *Graham*, 490 U.S. at 396). "The question is more broadly whether an officer reasonably should have known during handcuffing that his use of force was excessive." *Id.* In this Circuit, "where an officer's use of force in handcuffing is plainly unreasonable under the circumstances *or* where a plaintiff manifests clear signs of [his] distress—verbally or otherwise—a fact finder may decide that the officer reasonably should have known that his use of force was excessive for purposes of establishing a Fourth Amendment violation." *Id.*

Here, Plaintiff testified that his handcuffs were too tight during the encounter, and that this caused broken skin and bruising on his wrists. Tr. 24, 40-41; *see* Pl.'s Ex. 1. Plaintiff only complained once to Patterson and Hutchins about the handcuffs; this took place in the car, because prior to being in the car, Plaintiff did not realize that he had been handcuffed. Tr. 95. Patterson unlocked the handcuffs shortly after. Tr. 26-27. As to the first two evidentiary factors, even accepting that the handcuffs may, in fact, have become unreasonably tight at some point during the encounter, Patterson and Hutchins did not ignore Plaintiff's complaint—the handcuffs were removed shortly after Plaintiff asked Patterson to remove his identification from his rear pocket, which is also when Plaintiff testified that he complained about the handcuffs. Tr. 26-27, 97-98, 180-81, 295-96. Plaintiff estimated that he was in the back of the car in handcuffs for approximately two to three minutes, and also testified that the handcuffs were removed "within seconds" of him making his complaint.

And while Plaintiff was able to demonstrate some injury to his wrists, he has not proven by a preponderance of the evidence that he sustained any serious physical injuries from the application of the handcuffs.  Plaintiff provided photographs that showed broken skin and bruising on his wrists, and noted that the bruising on his wrists remained painful for several days. Tr. 41-43.  Plaintiff did not seek medical attention for the injuries to his wrists, although he asserted that the incident "aggravated" his preexisting wrist conditions.  Tr. 109-11.  In sum, Plaintiff was restrained in handcuffs for just a few minutes, the handcuffs were removed promptly after he complained to officers about them, and although he suffered injuries, they were relatively minor and short-lived.  "There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008); *see also Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (collecting cases where bruising, swelling, and cuts were found insufficient to sustain excessive force handcuffing claims).

Plaintiff also asserts, however, that the officers should have known that the force they used in handcuffing Plaintiff was excessive because they failed to "double lock" the handcuffs. The Court disagrees.  While it was evidently the policy of the Mount Vernon Police Department to "always double lock cuffs," the officers' failure to do so here does not rise to the level of excessive force.  *See* Pl.'s Ex. 14; Tr. 193-94.  As both officers testified, they were told in their training that if a subject was non-compliant, they should focus on getting the handcuffs on as quickly as possible, and did not need to double lock them.  Tr. 268, 296-97.  While there may have been a fleeting moment after the handcuffs were applied to Plaintiff where the need for force from Patterson and Hutchins abated, the totality of the evidence makes clear that this

moment was short lived.  Plaintiff continued to yell and scream at a loud volume as the officers attempted to move him to the vehicle, and further attempted to stop himself from being placed in the vehicle by placing his leg on the doorframe.  This chaotic situation was not stable enough to enable Patterson or Hutchins to safely and reasonably double lock the cuffs in the manner demonstrated during the trial.  Moreover, the failure to double lock handcuffs is not *per se* excessive force.  *See Getz v. Swoap*, 833 F.3d 646, 655 (6th Cir. 2016) ("[W]e have never held that an officer's failure to check for tightness or double lock handcuffs at the moment of arrest is, *per se*, excessive force.").  Additionally, as discussed above, the officers responded promptly to Plaintiff's complaint that the handcuffs were hurting him, which distinguishes this case from others in this Circuit where officers did not double lock handcuffs and subsequently ignored pleas from arrestees that the handcuffs were hurting them.  *See Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 447 (D. Conn. 2013) (ruling on summary judgment that a rational jury could find that officer used excessive force when he failed to double lock handcuffs and did not stop police cruiser when arrestee "cried out" in pain).  Keeping in mind that the test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case," the Court cannot conclude that the officers' failure to double lock Plaintiff's handcuffs in this case rose to the level of excessive force, or that the circumstances of the application of handcuffs though the course of the encounter constituted excessive force.  *See Graham*, 490 U.S. at 396.

### D.     Failure to Intervene

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it."  *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d

Cir. 2016).  "Liability attaches on the theory that the officer, by failing to intervene, becomes a

tacit collaborator in the illegality."  *Id.* (quotation marks omitted).  An officer may only be held

liable for failing to intervene when "(1) the officer had a realistic opportunity to intervene and

prevent the harm; (2) a reasonable person in the officer's position would know that the victim's

constitutional rights were being violated; and (3) the officer does not take reasonable steps to

intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  An officer

cannot be liable for failing to intervene to prevent a constitutional violation when the Court has

determined that there was no constitutional violation in the first place.  *Kayo v. Mertz*, 531 F.

Supp. 3d 774, 799 (S.D.N.Y. 2021) (citing *Wieder v. City of New York*, 569 F. App'x 28, 30 (2d

Cir. 2014) (summary order)).

Because the Court has concluded that there was no use of excessive force during the

March 28, 2017 encounter with Plaintiff, Hutchins cannot be liable on a theory of failing to

intervene, as there was no constitutional right being violated during the incident.

## II.  Assault and Battery Claims

"The elements of New York assault and battery and Section 1983 excessive force claims

are 'substantially identical." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021)

(quotation marks omitted).  Civil assault under New York law "'is an intentional placing of

another person in fear of imminent harmful or offensive contact,'" whereas civil battery "'is an

intentional wrongful physical contact with another person without consent.'"  *Id.* (quoting

*Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)).  In order to prove an assault or

battery claim in the law enforcement context, a plaintiff must also demonstrate that the defendant

officer's conduct "'was not reasonable within the meaning of the New York statute concerning

justification of law enforcement's use of force in the course of their duties.'"  *Id.* (quoting *Nimely*

*v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005)).  New York Penal Law § 35.30 establishes a justification defense for an officer's use of force in the course of several enumerated public duties." *Id.*  Of particular relevance here, the statute provides that "[a] police officer . . . may use physical force when and to the extent he or she reasonably believes such to be necessary to effect [an] arrest . . . ."  N.Y. Penal Law § 35.30(1).  This statute requires a finder of fact "to conduct precisely the same analysis as does the reasonableness standard" under the Fourth Amendment.  *Heath v. Henning*, 854 F.2d 6, 9 (2d Cir. 1988); *accord Taylor v. Quayyum*, No. 16-cv-1143 (GHW), 2021 WL 6065743, at *8 (S.D.N.Y. Dec. 21, 2021).

Because the Court has concluded that Patterson's use of force was objectively reasonable during the March 28, 2017 encounter with Plaintiff, Plaintiff also has failed to prove his state law claims for assault and battery by a preponderance of the evidence.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to prove, by a preponderance of the evidence, that Defendants are liable on any of the claims asserted by Plaintiff in this action

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants on all of Plaintiff's remaining claims, and to close this case.

Dated: March 31, 2023
       White Plains, New York

                                        **SO ORDERED.**

                                        _____
                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge